QUINLIVAN v. NORTHWESTERN FIRE & MARINE INS. CO. et al.

Circuit Court of Appeals, Second Circuit. January 6, 1930.

No. 147.

Bigham, Englar & Jones, of New York City (George S. Brengle and Martin P. Detels, both of New York City, of counsel), for appellants.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (William H. Mc-Grann and Roger B. Siddall, both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge. Appellee was the owner of· a suction dredge, No. 7, 80 feet long and 24 feet wide. It had no motive power, but was equipped with a boiler and engine for operating the suction pump. A ladder, fitted forward, controlled the suction line and cutter at the bow. The suction pump was an ordinary centrifugal pipe located amidships. It discharged into a 12-inch cast iron elbow pipe, 7 feet long and with a 90° curve. The forward end of this pipe was bolted to the suction pump; the after end was connected to the discharge line, which ran aft, on blocks, and left the dredge just below the water mark. The pontoon pipe, in sections, was affixed to the after end of the discharge pipe, and the shore pipe was used when it was desired that the spoils recovered by the dredge be deposited on shore. The discharge elbow was bolted to the suction pipe.

While the dredge was in operation on January 24, 1926, it picked up a stone, which passed through the cutter, the suction pipe, and the pump, and broke a large hole in the cast-iron discharge 'elbow. Water was pumped through this hole, for it was impossible to immediately stop the pump, and flowed back from the discharge pipe and pontoon pipe, and sank the dredge. The resulting damage is the subject-matter of these libels.

Three libels were filed on three policies of insurance, materially identical, except as to the amounts of insurance, to recover the loss. The dredge was insured against "the adventures and perils of the harbors, bays, sounds, seas, rivers and other waters as above named, and fires, that shall come to the hurt, detriment or damage of said vessel or any part thereof."

An express exception of the coverage was as follows: "Excepting always, all claims arising from or caused by the following, or other legally excepted causes, viz. * * * from the bursting or explosion of boilers, collapsing of flues, or any injury, derangement or breakage of machinery unless caused by stress of weather, stranding, collision or burning."

The theory of recovery, which was accepted below, is that a discharge pipe did not constitute part of the machinery, but part of the hull, and that the sinking, occurring in the manner described, was due to a peril of the sea. There was no claim that the loss of the dredge was due to stress of weather, stranding, collision, or burning, and the policy covers no injury due to negligence or latent defects.

■■ If the discharge elbow was part of the machinery, and came within the exception in the policies, there is no liability. Machinery is not synonymous with machine, for it is of much broader application, more comprehensive and extensive in its significance. Machinery includes appurtenances necessary to the working of a machine. 38 Corpus Juris, 330, 331. The policy covers the dredge in the following specification: "Her body, tackle, apparel and furniture, stores, supplies, engines, boilers, machinery and appurtenances." The elbow in the discharge line could only be embraced within the category of machinery, as the policy classifies the various parts of the dredge. The discharge elbow, it is argued, is part of the hull. It was permanently bolted to the pump, and the pump could not perform its dredging operation without the discharge elbow. The hull of the vessel was built by a shipbuilding company, and the machinery installed by an engineering company, and the latter, in installing the pipes, furnished the discharge elbow. In construction, the discharge line was physically distinct from the hull. It was supported by wooden blocks. The function of the hull was to keep the dredging machinery afloat, and the function of the machinery, including the pipe line, was for dredging only. Any part of the apparatus or appliance used for dredging should be regarded as machinery, for its purpose was to keep up the operation of the dredge. The court below said the elbow pipe also kept the water out of the hold in its normal operation, and held therefore that it was part of the hull. But this service was purely incidental; it was not the primary purpose or function of the elbow pipe. This incidental service does not make it a part of the hull, any more than does the propeller· shaft, which keeps out the water from the hull by filling up an opening from which it emerges from the hull, and the propeller shaft would not be described as part of the hull. In Washington Gas Light Co. v. District of Columbia, 161 U. S. 316, 16 S. Ct. 564, 40 L. Ed. 712, the mains or pipes laid down in a public street to distribute gas were held to constitute a part of the machinery by means of which the corporate

business was carried on. Dies inserted in power presses used to cut out shapes of tin were held to be part of the engine and machinery for the manufacture of tinware. Seavey et al. v. Central Mut. Fire Ins. Co., 111 Mass. 540. "Machinery" is defined in Funk and Wagnalls' New Standard Dictionary as:

"The parts of a machine or engine, or a number of machines and kindred appliances, taken collectively; as, the machinery of a watch; machinery driven by a turbine. Any combination of means working together; a complex system of appliances; the arrangements for effecting a specific end."

In N. K. Fairbank & Co. v. Cincinnati Railway (C. C. A.) 81 F. 289, 291, it was held that a car axle was not machinery, within the meaning of the exception reading "extends to boiler and machinery," and the court said:

"In this light, 'machinery' only includes the mechanical instrumentalities present in the engine room of the steamer or the locomotive of the train. The cars and their appurtenances are the things which are being moved or drawn by the machinery. Parts of the car are not, in our opinion, in the common acceptation of the term, embraced within the term 'machinery,' especially when that is associated with the term 'boilers.' * * * The wheels and axle are necessary to the movement of the car, just as the hull and plates on the ship are necessary to its progress through the water; and in a wide sense they are a part of the machinery necessary to render the transportation of the train or ship possible."

This language of Chief Justice Taft, then a Circuit Judge, points out the distinction marked by the function of the thing thought to be embraced within the term "machinery." In the English case of The Arsa, 23 Ll. List, L. R. 273, a nonreturn valve on a discharge pipe was held to be part of the hull, but there the primary purpose of the function of the valve was to keep the water out. That is a hull function, and the valve was properly classified as part of the hull, and not the machinery.

It is argued that the discharge pipe and elbow was known to the trade as the "hull" pipe, but from the testimony of the experts it appears that this name was used merely to differentiate the pipe used in the hull from the lighter "pontoon" pipe and the "shore" pipe. Such appellation did not alter the character of the pipe, its use and function. Such nomenclature should not al-ter the classification of the discharge elbow, when its function and use is clear and its attachment to the hull is known.

Concluding, as we do, that the elbow pipe comes within the exception which relieves the appellants from obligation for "breakage of machinery," unless caused by "stress of weather, stranding, collision, or burning," it becomes unnecessary to consider the other defense urged that this was not a peril of the sea.

The appellants' objection to the liability imposed is well founded, and the decree is reversed.

Decree reversed.